IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MONTANA
MISSOULA DIVISION

| | |
|---|---|
| ALLIANCE FOR THE WILD ROCKIES, NATIVE ECOSYSTEMS COUNCIL, | CV 12–150–M–DLC |
| Plaintiffs, | ORDER |
| vs. | |
| FAYE KRUGER, Regional Forester of Region One of the U.S. Forest Service, UNITED STATES FOREST SERVICE, an agency of the U.S. Department of Agriculture, and U.S. FISH AND WILDLIFE SERVICE, an agency of the U.S. Department of Interior, | **FILED** **JUN 2 4 2013** Clerk, U.S. District Court District Of Montana Missoula |
| Defendants. | |

## INTRODUCTION

Plaintiffs filed suit on September 6, 2012, seeking judicial review of the U.S. Forest Service's Record of Decision and Environmental Impact Statement ("EIS") permitting implementation of the Cabin Gulch Project ("Project") on the Helena National Forest ("Forest"). Plaintiffs also seek review of the Helena National Forest Land and Resource Management Plan ("Forest Plan").

1

Plaintiffs claim the Project and the Forest Plan violate Section 7 of the Endangered Species Act ("ESA") because the United States Forest Service ("Forest Service") failed to complete ESA consultation for grizzly bears and lynx for the Project. Plaintiffs also argue Defendants' ESA consultation for grizzly for the Forest Plan is inadequate. They claim the Project and the Forest Plan violate the National Forest Management Act ("NFMA") and National Environmental Policy Act ("NEPA") in various ways. Plaintiffs further allege the Project EIS fails to sufficiently address elk management and violates standards for elk habitat effectiveness and security; the Forest Plan Amendment did not have appropriate public involvement, appropriate environmental analyses, or use the best available science; the Project violates the Management Area T-3 standard; the EIS fails to take a hard look at whitebark pine restoration and lynx and grizzly presence; the EIS fails to address Standard ALL S1; and the EIS fails to address the best available science on grizzly management.

Defendants respond that the Project and Forest Plan comply with the ESA because (1) no consultation was needed because the agencies reasonably determined the grizzlies and lynx were not species that may be present in the Project area; (2) there is no basis for a formal ESA consultation because the agencies agree the Project is not likely to adversely affect either species; and (3)

2

Plaintiffs' arguments regarding the 2006 Forest Plan Biological Opinion are irrelevant and Plaintiffs lack standing to challenge it. Defendants further argue the Project complies with their obligations under NEPA and NFMA because they relied on the best available science; the Forest Plan Amendment had appropriate public notification; the Project is consistent with Management Area T-3 Standard; the EIS fully considered the effects on whitebark pine; and lynx and grizzlies are not species that may be present in the Project area.

Plaintiffs' motion to supplement the record will be denied and their motion for summary judgment will be denied on all claims except their claim regarding violation of the ESA consultation requirements for lynx. Defendants improperly substituted a higher "occupancy" standard pursuant to ESA Section 4 when determining whether lynx "may be present" under ESA Section 7 consultation. This procedural error mandates enjoining the Project and remand of this case for Defendants to consider whether lynx are a species that "may be present" under the proper standard. Plaintiffs ESA claims regarding grizzly bears fail because it appears Defendants followed the correct "may be present" standard, and even if they did not, Plaintiffs' evidence regarding grizzly bear presence does not meet the "may be present" standard. Plaintiffs do not demonstrate that Defendants' decisions regarding elk habitat violate NEPA or NFMA, and the remainder of their

3

NEPA and NFMA claims fail for the reasons stated herein.

## MOTION TO SUPPLEMENT THE RECORD

Plaintiffs filed a motion to supplement the administrative record on December 4, 2012. (Doc. 9.) Plaintiffs filed their motion for summary judgment based upon facts assuming the motion would be granted prior to the Court ruling on the motion to supplement, so the Court deferred ruling until resolution of the cross summary judgment motions. A portion of Plaintiffs' argument regarding whether grizzlies may be present in the Project area is based upon information contained within the proposed supplement to the record.

Judicial review of actions brought under the Administrative Procedures Act limit the scope of review to the administrative record. *Camp v. Pitts*, 411 U.S. 138, 142 (1973). The initial presumption is that the agency properly designated the administrative record. *Cook Inletkeeper v. EPA*, 400 F.App'x 239, 240 (9th Cir. 2010) (quoting *Bar MK Ranches v. Yuetter*, 994 F.2d 735, 740 (10th Cir. 1993)). However, the whole administrative record is not necessarily what has been submitted by the agency, because it includes documents and materials both directly and indirectly considered by agency decision-makers. *Thompson v. U.S. Dep't of Labor*, 885 F.2d 551, 555 (9th Cir. 1989).

Four exceptions to this rule are generally considered for supplementation of

4

an administrative record: (1) when necessary to determine whether the agency has
considered all relevant factors and explained its decision, (2) when the agency has
relied on documents not in the record, (3) when supplementing the record is
necessary to explain technical terms or complex subject matter, or (4) when
plaintiffs make a showing of agency bad faith. *Ctr. for Biological Diversity v. U.S.
Fish & Wildlife Serv.,* 450 F.3d 930, 943 (9th Cir. 2006) (citing *Southwest Ctr. for
Biological Diversity v. U.S. Forest Serv.*, 100 F.3d1443, 1450 (9th Cir. 1996)).
Supplementation of the record with non-agency materials may be appropriate
when reviewing an ESA citizen-suit failure-to-consult claim. *See Western
Watersheds Project v. Kraayenbrink*, 632 F.3d 472, 497 (9th Cir. 2011)(district
court may review material outside the record when reviewing ESA claim).  Courts
within this district have held that

> *Kraayenbrink* leaves us uncertain whether the panel discarded the APA
> record review rule entirely or simply found that the extra-record documents
> presented to the district court in that case fit within one of the four standard
> exceptions outlined above. The better view, in the opinion of this Court, is
> that the traditional four exceptions still apply to plaintiffs' requests for
> supplementation of the administrative record for ESA claims, but the
> narrowness of the construction and application of these exceptions, *see
> Lands Council v. Powell*, 395 F.3d 1019, 1030 (9th Cir. 2005) ("these
> exceptions are narrowly construed and applied"), should be relaxed for such
> claims.

*Alliance for the Wild Rockies v. United States Dept. of Agriculture*, CV 11-76-M-
CCL, doc. 64 at 6 (July 23, 2013).

This Court agrees that the four exceptions outlined above apply here, and Plaintiffs have not met their burden of demonstrating the proposed supplemental materials should be considered under any exception. Exhibit 3 is an October 16, 2011 Helena Independent Record newspaper article discussing a possible grizzly bear sighting near Helena, Montana. It was not considered in the decision to approve the project, but the Forest Service did consider "the actual records of observations and other evidence of relevant grizzly bear occurrence in analyzing the effects of the Project." (Doc. 11-2 at 3.) Thus, the article is not necessary to determine whether the agency has considered all relevant factors because the agency considered the unverified sightings as part of its decision.

Exhibit 4 is an Interagency Grizzly Bear Committee Taskforce Report (1998) that evaluates effects of motorized access on grizzly bears within recovery zones. The Project is not in a grizzly bear recovery zone, and the key issue regarding grizzly bears in this case is whether Defendants appropriately determined they are not a species that may be present in the Project area. For these reasons, Exhibit 4 is irrelevant and does not fall within any exceptions permitting supplementation of the record.

Exhibit 5 is a study by Schwartz et al. entitled "Hazards Affecting Grizzly Bear Survival in the Greater Yellowstone Ecosystem" (2010). Again, relevancy of

6

this study is questionable at best because the Project is not in the Yellowstone Ecosystem and survival of the grizzly bear is not directly at issue. This document also does not fall within an exception and the Court will not consider it. Plaintiffs do not surmount the presumption that the agency properly designated the administrative record and their motion to supplement will be denied.

### MOTION FOR SUMMARY JUDGMENT

### FACTS

The Project is a timber sale planned for 15,600 acres within the Big Belt Mountain Range ("Big Belts") 15 miles northeast of Townsend, Montana. FS: 155125.[1] A mountain pine beetle outbreak has killed many trees within the Project area. *Id.* The goals of the Project are to create vegetative conditions that resist fire and further insect infestation, reduce hazardous fuels, improve water quality, and provide timber. *Id.* The Project's activities take place on 2,891 acres and include: commercial thinning on 331 acres, improvement cuts of approximately 1,222 acres, pre-commercial thinning on approximately 86 acres, research thinning on approximately 233 acres, prescribed fire on 602 acres, regeneration harvests on 417 acres of which 286 acres target whitebark pine establishment. FS: 56208.

---

[1] Citations are as follows: FS (Forest Service) or FWS (Fish and Wildlife Service) record: XXXXXX (bates number of page in record).

Other activities include construction of 2.3 miles of temporary roads and 4.2 miles of short-term specified roads. *Id.* Approximately 9.5 miles of existing roads will be decommissioned. *Id.*

Plaintiffs' claims involve three species: lynx, grizzly bears, and elk. The 2007 Northern Rockies Lynx Management Direction ("Lynx Direction") determined the Big Belts are unoccupied by lynx, with "occupied" status determined by evidence of reproduction or two verified sightings of non-transient animals since 1999. FS: 43191; 55456. At least three radio-collared lynx originally dispersed in Colorado traveled through the Big Belts for a few weeks between 2004-2006. FS: 15152. The Final Environmental Impact Statement ("EIS") reports that grizzly bears and lynx do not occur in the Big Belts based on the species list from Wildlife Service and the Lynx Direction. FS: 55439. The EIS also states that sightings of both species have been reported but are unconfirmed. *Id.*

Elk are found throughout the Project area which includes two elk herd units containing public and private land and roads. FS: 559490. The Project area contains whitebark pine, which is a key food source for grizzly bears. (Doc. 8 at 6.)

8

**ANALYSIS**

## I. ESA

Plaintiffs claim that Defendants violated section 7 of the Endangered

Species Act, the "heart of the ESA," *W. Watersheds Project*, 632 F.3d at 495, by

failing to consult with the Wildlife Service to evaluate the consequences of the

Project on grizzly bears and lynx. 16 U.S.C. § 1536(a)(2). Plaintiffs also argue

Defendants' ESA consultation for grizzly bears for the Forest Plan is inadequate.

Section 7 requires an agency to ensure that no discretionary action will

"jeopardize the continued existence of any endangered species or threatened

species or result in the destruction or adverse modification of [critical] habitat of

such species." 16 U.S.C. § 1536(a)(2); 50 C.F.R. § 402.12(a). "Only after the

[agency] complies with § 7(a)(2) can any activity that may affect the protected

[species] go forward." *P. Rivers Council v. Thomas*, 30 F.3d 1050, 1055–57 (9th

Cir. 1994).

The Forest Service's first step in complying with section 7 is to obtain from

the Wildlife Service "a list of any listed or proposed species or designated or

proposed critical habitat that *may be present* in the action area." 16 U.S.C. §

1536(c)(1); 50 C.F.R. § 402.12(c)–(d) (emphasis added). If the Wildlife Service

advises that a listed species or critical habitat may be present, the Forest Service

9

must complete a biological assessment to determine if the proposed action "may affect" or is "likely to adversely affect" the listed species. 16 U.S.C. § 1536(c)(1); 50 C.F.R. §§ 402.12 (f), 402.14(a), (b)(1); *Forest Guardians v. Johanns*, 450 F.3d 455, 457 (9th Cir. 2006). Once the biological assessment is completed, it must be shared with the Wildlife Service. 50 C.F.R. § 402.12(j). "If [the Wildlife Service] advises that no listed species or critical habitat may be present, the Federal agency need not prepare a biological assessment and further consultation is not required." 50 C.F.R. § 402.12(d).

A determination by the Forest Service in a biological assessment that an action "may affect" a listed species or critical habitat gives rise to a consultation requirement under section 7 of the ESA. *Karuk Tribe of Cal. v. U.S. Forest Serv.*, 681 F.3d 1006, 1027 (9th Cir. 2012). The Ninth Circuit holds that "the minimum threshold for an agency action to trigger consultation with the Wildlife Service is low." *W. Watersheds Project*, 632 F.3d at 496. "[A]ny possible effect, whether beneficial, benign, adverse, or of an undetermined character, triggers the formal consultation requirement." *Id.* (citing 51 Fed. Reg. 19,949; *Cal. ex rel. Lockyer v. U.S. Dept. of Agric.*, 575 F.3d 999, 1018–19 (9th Cir. 2009)).

There are two forms of consultation: formal and informal. *Karuk Tribe of Cal.*, 681 F.3d at 1027. Formal consultation is necessary where the Forest Service

10

has determined that an action is "likely to adversely affect" a listed species.  But it

is not required if 1) the Forest Service finds, either in its biological assessment or

through informal consultation, that while a project "may affect" a listed species,

the species is "not likely to be adversely affected" and 2) the Wildlife Service

concurs in writing.  50 C.F.R. §§ 402.12(j)–(k), 402.14(b)(1), 402.13(a).

The Administrative Procedure Act governs review of agencies' actions

under section 7. *W. Watersheds Project,* 632 F.3d at 496 (citation omitted).  The

Court must determine whether the agencies' actions were "arbitrary, capricious, an

abuse of discretion, or otherwise not in accordance with law." *Id.* (citation

omitted).  "Deference to an agency's technical expertise and experience is

particularly warranted with respect to questions involving scientific matters."

*United States v. Alpine Land & Reservoir Co.*, 887 F.2d 207, 213 (9th Cir. 1989).

However, the "presumption of agency expertise may be rebutted if the decisions,

even though based on scientific expertise, are not reasoned." *Greenpeace v.

NMFS*, 80 F. Supp. 2d 1137, 1147 (W.D. Wash. 2000).

### A.  Grizzly Bears

Plaintiffs argue Defendants erred by not completing ESA consultation for

the grizzly bear because the best available science shows the Big Belts are a travel

corridor for grizzly bears and the EIS references grizzly sightings in the Project

area.  Defendants contend they reasonably concluded grizzly bears are not a

species that may be present because the Project area is well outside known grizzly

bear range as confirmed by the Wildlife Services' Species List dated August 2,

2011.  Defendants also question Plaintiffs' reliance on newspaper articles and

other anecdotal evidence to support their allegations, and argue Plaintiffs' citation

to Walker and Craighead (1997) is unpersuasive because that study is based on a

model not validated in the field.

Plaintiffs do not present sufficient evidence to establish the Forest Service's

conclusion that grizzly bears are not present in the Project area is arbitrary and

capricious.  5 U.S.C. § 706(2)(A).  "The arbitrary and capricious standard is highly

deferential, presuming the agency action to be valid and [it] requires affirming the

agency action if a reasonable basis exists for its decision." *Kern Co. Farm Bureau*

*v. Allen*, 450 F.3d 1072, 1076 (9th Cir. 2006) (internal brackets and quotation

marks omitted).  Although the Court's review of the facts is thorough, the Court

may not substitute its judgment for that of the agency and the ultimate standard of

review is narrow.  *Citizens to Preserve Overton Park, Inc. v. Volpe*, 401 U.S. 402,

416 (1971).

Here, the Forest Service's decision that grizzly bears are not a species that

may be present in the Project area was not arbitrary and capricious under this

12

deferential review standard. The "credible sightings" of grizzly bears Plaintiffs rely on arise from the supplemental newspaper article that will not be considered. Plaintiffs' argument that the Big Belts in general are the best travel corridor for grizzly bears traveling from Yellowstone to the Rocky Mountain Front is not supported by any evidence. The Walker and Craighead (1997) study is based on a model not validated by field research and it generally states "the potential corridor offering the best chance of successful transit consists of the Gallatin, Bridger, and Big Belt mountain ranges." This unsubstantiated model does not in any way prove grizzly bears may be present in the Project area, which only makes up a small portion of the Big Belts.

The Big Belts mountain range is 325,000 acres and the Forest Service's decision only concerns the area affected directly or indirectly by the Project. 50 C.F.R. § 402.02. The Project area involves 15,600 acres. Further, Defendants recognized and considered the Walker and Craighead (1997) findings regarding the Big Belts corridor in the EIS. FS: 55439; 55485-86. The Forest Service noted that the Big Belts operate as a linkage for a variety of species and *potentially* for grizzly bears as they expand their range. *Id.* at 55485. However, the Forest Service also pointed out that frequently used roads that bisect the mountain range may act as a barrier to movement. *Id.* This evidence does not convince the Court

13

that the Forest Service made a clear error in finding grizzly bears are not a species that may be present in the Project area.

Plaintiffs' strongest argument on this subject is that the EIS documents reported but did not verify grizzly bear sightings in the Project area. FS: 55456. Defendants respond that when read in context, the EIS actually reports unconfirmed sightings in the Big Belts in general, not in the Project area specifically. FS: 55439; 55456. It is unclear from the cited portions of the EIS whether the unconfirmed sightings occurred in the Project area or the Big Belts as a whole. A table outlining assumptions, information used, and methodologies used to determine effects to wildlife states "[t]he grizzly bear is not present in the Cabin Gulch Project Area according to the August 2, 2011 U.S. Fish and Wildlife Service Species List (See Project File). However, sightings have been reported although not verified." On the other hand, the EIS also reports that "[g]rizzly bears and lynx do not occur in the Big Belts, according to both the species list from the U.S. Fish and Wildlife Service and the Northern Rockies Lynx Management Direction. However, there have been reported sightings of both species but observations remain unconfirmed." FS: 55439; 55456. Defendants submitted an affidavit from the author of this language who confirmed that none

14

of the reported sightings occurred within the Project area. (Doc. 23-1 at 3.)[2]

Defendants also argue black bears are commonly mistaken for grizzly bears so

anecdotal data cannot be relied upon. FWS: 244. Finally, Defendants point out

that their continual monitoring of grizzly distribution areas has not uncovered any

evidence of grizzly bears in the Big Belts.

Plaintiffs' evidence is not sufficient to prove the Forest Service's conclusion

was clear error. *AWR v. Bradford*, 864 F.Supp.2d 1011, 1016-1020 (Mont. 2012).

In *Bradford*, the record evidence of grizzly bear presence included a Forest

Service report that grizzly bears utilized the area, three reported sightings with at

least one confirmed, and evidence of grizzly mortalities suggesting at least

occasional use. *Id.* at 1016. Here Plaintiffs' evidence boils down to reported but

unconfirmed sightings documented in the EIS from an unknown time outside of

the Project area. Similar to *Bradford*, the Forest Service has inter-agency support

from the Wildlife Service for its position that grizzly bears are not present. *Id.* at

1019. Defendants considered the reported sightings in making their decision and

did not clearly err by determining grizzly bears are not a species that may be

present.

---

[2]Because this affidavit merely clarifies an ambiguity within the record rather than
providing new evidence not available to the pubic, the Court will consider it.

15

Plaintiffs argue Defendants "impermissibly conflate the legal standard for *consultation* under Section 7 of the ESA with the legal standard for *designation of critical habitat* under Section 4 of the ESA." (Doc. 21 at 8.) Plaintiffs are correct that Defendants do use Section 4 "occupancy" language at times within the record and within their arguments on this issue. Plaintiffs are also correct that verified sightings or occupancy are not required to meet the low "may be present" standard. 51 Fed. Reg. 19926, 19946 (1986). "[M]igratory species that 'may be-present' at some point within the action area must be included in the species list." *Id.* Despite Defendants' occasional confusing use of "occupancy" language, it appears they ultimately followed the "may be present" Section 7 standard. Even if Defendants were improperly using the higher Section 4 "occupancy" standard, remand would not be necessary because the evidence Plaintiffs bring forth to challenge Defendants' decision does not satisfy the "may be present" standard. Further, this same evidence was considered by Defendants who reasonably determined grizzly bears are not a species that may be present in the Project area. Because Defendants did not err in so finding, the Court need not reach Plaintiffs' argument regarding whether the Project "may affect" grizzly bears. 16 U.S.C. § 1536(c)(1).

### B. Lynx

16

The Canada lynx is listed as a threatened species under the ESA.  65 Fed.

Reg. 16052 (March 24, 2000).  The Forest Service and Wildlife Service both

concluded lynx are not a species that may be present in the Project area.  FWS: 6-

7, FS: 55439.  Plaintiffs argue Defendants erred by not completing ESA

consultation for the Project for lynx due to this conclusion.  As with the grizzly,

Plaintiffs again argue Defendants improperly substituted Section 4's "occupancy"

standard for Section 7's "may be present" standard.  Plaintiffs identify the

following evidence in support of their argument: reported sightings of lynx in the

Big Belts; documentation of three radio-collared lynx traveling in the Big Belts;

and the existence of a lynx analysis unit and linkage area in the Project area.

Defendants respond that their conclusion is based on a lack of reliable data such as

physical remains, live capture, and DNA samples, which are all findings that

would relate to an occupancy analysis.  FWS: 394.  Defendants argue the Lynx

Direction determined the Big Belts were "unoccupied" by lynx and Defendants'

continued monitoring ensures this conclusion remains valid.  Defendants also

contend the studies and maps upon which Plaintiffs rely are stale and not the best

available science.

In May 2005, the Forest Service and the Wildlife Service revised the

Canada Lynx Conservation Agreement (2000) to include a commitment that both

17

agencies would jointly refine the criteria for classifying lynx habitat as occupied. FWS: 391.  In 2006, the Wildlife Service and the Forest Service agreed to an amendment that defined the requirements for occupancy, identified occupied lynx habitat, and determined that management guidelines were only required to be implemented in occupied habitat. *Id.*  They also agreed the Big Belts are unoccupied.  FS: 43169.  In 2007, the Forest Service published the Lynx Direction which superseded the prior agreements.

The Lynx Direction incorporated the 2006 amendment's definition for occupancy.   For a forest to be deemed occupied, there must be 1) two verified lynx observations since 1999 "unless they are verified to be transient individuals" or 2) evidence of reproduction in the area.  FS: 43191.  The Lynx Direction classified the Helena National Forest as occupied, although isolated mountain ranges within it including the Big Belts are unoccupied.  *Id.* at 43215.

The Lynx Direction anticipated that the Wildlife Service would not include lynx on species lists for forests deemed unoccupied, because the Wildlife Service did not include lynx on species lists for unoccupied forests under the 2006 amendment.  FWS: 392.  In a memorandum regarding the 2006 amendment, the Wildlife Service advised Ecological Services Project Leaders that "the lynx should not appear on species lists for proposed Federal actions on national forests

18

determined to be unoccupied by lynx.  Compliance with section 7(a)(2) of the

Endangered Species Act is not required for the lynx under this circumstance." *Id*.

If "the agency has chosen a definition that comports with the text and

purposes of the [ESA] and is not 'decidedly irrational, it is not [the Court's] place

to second-guess its judgment." *Bassiri v. Xerox Corp.*, 463 F.3d 927, 933 (9th Cir.

2006).  The problem here is that the Wildlife Service has substituted a much

higher standard to section 7 of the ESA than the statutory and regulatory language

supports.  The requirement that a species "may be present" is much broader than

the Wildlife Service's requirement that a forest be "occupied."

Plaintiffs bring forth the following evidence that lynx may be present:

1.    Ruggiero et al (1994), a Forest Service General Technical Report entitled

       "The Scientific Bases for Conserving Forest Carnivores: American Marten,

       Fisher, Lynx, and Wolverine in the Western United States," states that lynx

       are present in the Forest.  FS-036754.

2.    McKelvey et al (2000), "History and Distribution of Lynx in the Contiguous

       U.S.," shows a map of historical lynx presence that indicates that lynx have

       been/are present in the Forest and Big Belts.  FWS-000655.

3.    Ruediger et al (2000), the agencies' "Canada lynx conservation assessment

       and strategy," considers the Forest within the geographic extent of the lynx

strategy, FS-036563, identifies the northern Rocky Mountains and the "Belts Mountains Section" as a lynx geographic area, FS-036484-87, and states "Lynx presence has also been verified in the Big Belt . . . Mountains." FS-036487.

4.    FWS's final map (2003) for lynx shows that the Big Belts are within the range of both resident and dispersing lynx.

5.    In Devineau (2010), the State of Colorado Division of Wildlife documented locations of radio-collared lynx released in Colorado.  FS-023478-85.

6.    A spreadsheet sent from the State of Colorado to the Forest Service shows multiple lynx traveling in the Forest, including at least three individual lynx traveling in the Big Belts.  FS-015152.

7.    In litigation over lynx critical habitat in 2010, FWS admitted that the Forest is occupied. *Alliance for Wild Rockies v. Lyder*, 728 F. Supp. 2d 1126, 1133 (D. Mont. 2010)("Plaintiffs take exception to the Service's failure to designate the . . . Helena [and certain other National Forests] as lynx critical habitat. [FN4] . . . In response, the government acknowledges the record shows such forests to be occupied . . . .")

8.    The Forest Service admits that there have been "reported sightings" and "anecdotal observations" of lynx in the Big Belts.  FS-055439; FS-056073.

9.    There is one formally designated and mapped lynx analysis unit in the
      Project area: Lynx Analysis Unit bb-05.  FS-056071.

10.   The Project area is within an agency-designated "linkage area" for the
      Canada lynx.  FS-057316.

11.   The agencies admit that the Forest Service's Big Belt Integrated Resource
      Analysis states: "WILDLIFE EXISTING CONDITION . . . . In particular,
      ELU 4 currently provides habitat for . . . lynx, although it is not known if
      these populations can be considered viable."  Answer ¶ 39; FS-040170.

12.   The Forest Service's Big Belt Integrated Resource Analysis also states that
      lynx "occurrence" is "possible" and that "cyclic populations vary with hare
      abundance."  FS-040355.

13.   "Priority Linkage Assessment – The Hub Conservation Area," a study cited
      by the Forest Service in the EIS, finds that lynx are known to be present in
      the northern Big Belts.  FS-019885-87.

      While Defendants dispute the accuracy and relevancy of much of this

evidence, they do so under the improper "occupancy" standard.  The evidence

cited by Plaintiffs at least raises a possibility that lynx may be present in the

Project area.  The ESA requires nothing more in order to trigger an agency's

obligation to perform a biological assessment or enter informal consultation with

21

the Wildlife Service.  If a species may be present, the agency must ensure the

proposed action will not adversely affect it, and must obtain the concurrence of the

Wildlife Service in its determination.  Defendants have not provided a reasoned

argument for now construing the "may be present" standard to require occupancy.

The Wildlife Service itself, analyzing section 7, once rejected the argument of a

commenter who urged the Service "to include only species actually known or

believed to occur in the action area":

> [T]he Act requires the Service to provide a list of all listed or proposed
> species that "may be present" in the action area. Thus, migratory species
> that "may be present" at some point within the action area must be
> included in the species list.

Interagency Cooperation—Endangered Species Act of 1973, as Amended; Final

Rule, 51 FR 19926-01.  Defendants now attempt to distinguish this response by

distinguishing "migratory species" from transient species like the lynx, but the

commentary was not so limited in its focus.  The Wildlife Service clearly rejected

a standard which would require a species to be "actually known or believed to

occur" in an area because it would conflict with the statutory language.

None of Plaintiffs' evidence fits the criteria for "occupancy," and other

evidence cited is arguably stale.  But the Wildlife Service's decision to reject the

evidence entirely is arbitrary and capricious, particularly considering the Wildlife

22

Service's earlier position on whether the "may be present" standard requires actual occurrence.   On its face, the question of whether lynx "may be present" in an area is less rigorous than the question of whether lynx "occupy" an area.  Applying the occupancy definition to the first step in the process "create[s] a metric more stringent than, and contrary to, what the ESA dictates." *Alliance for Wild Rockies v. Lyder*, 728 F. Supp. 2d 1126, 1137 (D. Mont. 2010).

The apparent expediency of the Wildlife Service's construction here does not permit the agencies to take a procedural shortcut.  The agencies must first determine whether a species "may be present," under a reasonable interpretation of the Act's plain language.  Only then should they consider the likelihood that the species will be affected, and that inquiry should be structured by the performance of a biological assessment or informal consultation.  The Defendants' approach conflates the procedural steps laid out in statute and regulation.  Because the Wildlife Service substituted its "occupancy" standard for the ESA's "may be present" standard, the agencies did not enter into informal consultation or have the opportunity to agree in writing that the action is "not likely to adversely affect" the lynx, despite the existence of at least some evidence that lynx "may" be in the area.  50 C.F.R. § 402.13(a).

The agencies' interagency agreement to reach this result in unoccupied

23

areas cannot override the statutory and regulatory language of the ESA or the

Ninth Circuit's direction that "the minimum threshold for an agency action to

trigger consultation with the Wildlife Service is low," *W. Watersheds Project*, 632

F.3d at 496, and "any possible effect, whether beneficial, benign, adverse, or of an

undetermined character, triggers the formal consultation requirement." *Id.*

(citations omitted).  Accordingly, the Project must be enjoined at least until the

Wildlife Service reconsiders its listing determination in accordance with this

opinion.  The agencies must determine whether the Project will likely adversely

affect the lynx prior to any formal consultation requiring a biological assessment.

50 C.F.R. §§ 402.13(a), 402.14(b).

### C.  ESA Consult for Grizzly Bears for the Forest Plan

Plaintiffs argue Defendant's failure to update the 2006 biological opinion,

which is the most recent consultation document for the Forest Plan, violates their

consultation duties under the ESA.  The 2006 biological opinion covers impacts of

Forest Plan standards for roads, sanitation, and grazing and only applies to areas of

the Lincoln and Helena Ranger Districts believed to be occupied by grizzlies.  FS:

12730.  The Cabin Gulch Project is in the Townsend Ranger District.  FS: 55125.

Defendants argue Plaintiffs lack standing on this issue because the biological

opinion played no role in the Cabin Gulch project, thus its alleged defects cannot

provide any basis for granting Plaintiffs' request to enjoin. Plaintiffs respond that the Project area is within the Belts/Dry Range Landscape area, which is an area that was excluded from the prior biological opinion but should be included upon reinitiated consultation because grizzly bear range has expanded.

To have standing under Article III, Plaintiffs must demonstrate: (1) they suffered or will suffer an "injury in fact" that is concrete, particularized, and actual or imminent; (2) the injury is fairly traceable to the defendant's challenged action; and (3) the injury is likely, not merely speculative, and will be redressed by a favorable decision. *Cantrell v. City of Long Beach*, 241 F.3d 674, 679 (9th Cir. 2001).

Plaintiffs do not provide sufficient evidence to warrant reinitiation of consultation for the Forest Plan regarding grizzly bears based on this Project. Plaintiffs' alleged injury regarding this issue is the allegation that grizzly bears are now present outside the 2002 Distribution Zone and the 2006 Biological Opinion does not adequately represent where grizzly bears may be present. (Doc. 21 at 17.) The only connection between this claim and the Project is the same evidence Plaintiffs used to challenge Defendants' conclusion that grizzly bears are not a species that may be present in the Project area. The Court has already determined that Defendants did not err in so finding. Formal consultation and a new

25

biological opinion are not required unless an action is "likely to adversely affect" a threatened or endangered species.  16 U.S.C. § 1536(a-c); 50 C.F.R. § 402.14. Plaintiffs do not even establish that grizzly bears may be present in the Project area–they therefore cannot prove Defendants erred by not reinitiating formal consultation prior to approving this Project.  Plaintiffs' alleged injury is thus not fairly traceable to the challenged action and falls within the speculative realm.  In short, Plaintiffs lack standing on this issue because their alleged injury is too far removed from their asserted remedy.  *Cantrell*, 241 F.3d at 679.

## II.  NEPA and NFMA

Under NFMA, the Forest Service must develop a Land Resource Management Plan (a forest plan) for each national forest, 16 U.S.C. § 1604(f)(1), which "provide[s] for diversity of plant and animal communities . . . in order to meet overall multiple-use objectives," 16 U.S.C. § 1604(g)(3)(B).  Subsequently, all projects planned within a forest must be consistent with the forest plan as well as any regulations in effect at the time of the decision.  *Native Ecosystems Council v. U.S. Forest Serv.*, 428 F.3d 1233, 1249 (9th Cir. 2005) (citing 16 U.S.C. 1604(l)); *Native Ecosystems Council v. Tidwell*, 599 F.3d 926, 932 n. 9 (9th Cir. 2010) (citation omitted).

NFMA regulations have been revised and replaced and subsequently

withdrawn many times over the past several years.  At this point, the Forest

Service may elect to follow the 1982 regulations "[u]ntil the Department

promulgates superseding planning regulations," 36 C.F.R. § 19.35(b) (2011).  The

Forest Plan at issue here was prepared in 1986 under the 1982 planning

regulations.  FS: 51406-07.  But the Record of Decision was signed for this

Project on March 6, 2012, so the 2000 planning regulations were in effect for the

Project.  However, the 2000 rule allows the Forest Service to use the

procedures of the 1982 rule (§ 219.10(f)(2000)) for plan amendments, which the

Forest Service did here.  FS: 56225; 55127, 55159.  The 2000 planning regulations

state that the Forest Service must consider the best available science in its site-

specific project analyses until new planning regulations, replacing the 1982

planning regulations and viability requirement, are finalized.  36 C.F.R. §

219.35(a) (2011).

NEPA requires federal agencies to prepare a detailed environmental impact

statement for actions that may significantly affect the environment.  42 U.S.C. §

4332(2)(C). Unlike NFMA, NEPA does not compel agencies to achieve particular

environmental results.  *Marsh v. Or. Natural Res. Council*, 490 U.S. 360, 371

(1989).  Agencies instead must abide by NEPA's procedural requirements to

"carefully consider" a project's environment impacts and make the relevant

information available to the public. *Robertson v. Methow Valley Citizens Council*, 490 U.S. 332, 349 (1989). An EIS must provide a "full and fair discussion of significant environmental impacts," and inform "decisionmakers and the public of the reasonable alternatives which would avoid or minimize adverse impacts or enhance the quality of the human environment." 40 C.F.R. § 1502.1.

Under NEPA, the Court must "simply [] ensure that the Forest Service made no 'clear error of judgment' that would render its action 'arbitrary and capricious.'" *Lands Council v. McNair*, 537 F.3d 981, 991 (9th Cir. 2008) ("*Lands Council I*"), *overruled in part on other grounds by Winter v. Nat. Resource Def. Council, Inc.*, 555 U.S. 7 (2008). A decision is arbitrary and capricious "only if the agency relied on factors Congress did not intend it to consider, entirely failed to consider an important aspect of the problem, or offered an explanation that runs counter to the evidence before the agency or is so implausible that it could not be ascribed to a difference in view or the product of agency expertise." *Id.* at 987 (citations and internal quotation marks omitted).

### A.  Project EIS on Elk Management

Plaintiffs allege the Forest Service failed to disclose and address several factors related to elk management in the Project EIS.

### 1.  Road Density: Weighting Private Roads

Plaintiffs argue Defendants did not comply with the best available science by only including 25% of private roads in their road density analysis. This argument oversimplifies Defendants' road density analysis. Defendants' EIS actually weighted roads according to their expected use, with public roads weighted by a factor of 1 and private roads weighted by a factor of 0.25. Defendants cite to several studies to support this analysis, arguing they show that roads with less use have less impact on elk, and private roads are used considerably less than public roads. (Doc. 18 at 29.) Plaintiffs contend the Project does not comply with Hillis et al. (1991) because that study recommends analysis units not be adjusted for land ownership. Plaintiffs cite to *Native Ecosystems v. Weldon* for the proposition that "the Forest Service's decision to exclude private lands was unexplained and so is arbitrary and capricious." 848 F.Supp.2d 1207, 1218 (D. Mont. 2012). Finally, Plaintiffs contend *Native Ecosystems Council v. U.S. Forest Service* applies where the Forest Service was not permitted to exclude private lands from its calculation of elk hiding cover in a timber sale EIS. 418 F.3d 953, 962 (9th Cir. 2005).

Defendants did not violate NFMA or NEPA by weighting private roads at a factor of 0.25. Hillis' recommendation regarding adjustments for land ownership is not directly applicable to Defendant's road density analysis because Hillis

29

defines elk security habitat analysis units–a much broader issue of which road density is only a part. FS: 027842. *Native Ecosystems v. Weldon* dealt directly with the Forest Service's failure to apply road-density standards to any private lands in the analysis unit and its failure to explain why private lands were excluded. 848 F.Supp.2d at 1218. Here, the Forest Service considers all private roads but weighs them less because their studies show roads used less frequently have less impact on elk. This analysis was laid out in detail in the EIS with citations to the studies relied upon. FS: 55453-54. The Court in *Weldon* ordered the Forest Service, on remand, to "present a reasoned discussion of why it analyzed only Forest lands and not adjacent private lands." 848 F.Supp.2d at 1218. The Forest Service did the required analysis here, and the Court will not second guess its reasoned decision.

*Native Ecosystems Council* also does not support Plaintiffs' argument because that case involved the exclusion of sections of private land from elk summer range hiding cover such that the Court could not ascertain if the Forest Service was in compliance with the Forest Plan. The Court also pointed to the Forest Service's contradictory acreage calculations in the record in finding NEPA and NFMA violations. *Native Ecosystems Council*, 418 F.3d at 964. In this case, Defendants weigh private roads to reflect their reduced impacts on elk–a concept

30

supported by their cited studies.  Defendants included their analysis and the studies on which they relied in the EIS, so the public was fully informed of their decision.  Plaintiffs do not establish that Defendants committed clear error under NEPA or NFMA regarding their road density analysis.

### 2.  Consideration of Temporary and Administratively Closed Roads

Plaintiffs contend the Forest Service failed to consider the impacts temporary roads and administratively closed roads will have on elk during the Project.  Specifically, Plaintiffs argue the Forest Service did not disclose habitat effectiveness percentages, road density percentages, or elk security percentages, and the general statements in the EIS do not constitute the required "hard look." Defendants respond that the Forest Plan does not require analysis of elk habitat effectiveness or security at any level of detail.  Defendants argue road density under Forest Plan big game standard #4(a) need not be assessed during the Project, but even if it was required, NEPA does not mandate a mathematical road density calculation.  Finally, Defendants state that they provided specific and quantified data on temporary and administrative road density even though it was not required.

Under NFMA, the Forest Service was required to follow the Forest Plan and the regulations regarding elk habitat effectiveness and security.  Under NEPA,

31

the Forest Service was required to provide an EIS entailing a "full and fair

discussion of significant environmental impacts" for the public's review.  The

Forest Plan states that an EIS will include a cover analysis on a drainage or elk

herd unit basis.  "On elk summer range the minimum size area for hiding cover

will be 40 acres and the minimum size area on winter range for thermal cover will

be 15 acres."  FS: 51432.  Further, "[s]ubject to hydrologic and other resource

constraints, elk summer range will be maintained at 35 percent or greater hiding

cover and areas of winter range will be maintained at 25 percent or greater thermal

cover in drainages or elk herd units."  FS: 51430.  The Forest Plan implements

road management that at least maintains big game habitat capability and hunting

opportunity, but the only specific numerical limits regarding hiding cover and road

density apply exclusively to hunting season.  *Id.* at 51431.  The Forest Plan further

mandates that the Montana Cooperative Elk-Logging Study Recommendations be

followed during timber sale projects.  *Id.*

Defendants are correct that the Forest Plan does not mandate analysis of elk

habitat effectiveness or security during Project implementation in any specific

detail.  Even so, the Forest Service did analyze the effects of temporary roads

during the Project and followed the mitigation measures in the Forest Plan.

Plaintiffs' reliance on *Neighbors of Cuddy Mountain v. United States Forest*

32

Case 9:12-cv-00150-DLC   Document 26   Filed 06/24/13   Page 33 of 53

*Service*, 137 F.3d 1372, 1378-80 (9th Cir. 1998) is misplaced because the requirement for quantified or detailed information discussed in that case applied in the context of a cumulative effects analysis. That is not the context of the parties' arguments here.

Defendants point to areas in the record where they considered "temporary roads within herd units by alternative during project implementation" as well as open road density post-implementation. FS: 18744. The Forest Service recognized that road usage during the Project will impact elk and result in short-term displacement. The Forest Service took multiple mitigation measures to address this impact including:

- limiting logging to a single drainage at a time;

- protecting calving and nursery areas;

- closing temporary roads to the public;

- prohibiting logging during the first two weeks of hunting season; and

- prohibiting road construction and winter harvest in winter range.

FS: 55592.

Defendants also followed Forest Plan Standard 6, or the Montana Elk-Logging Study mitigation recommendations for timber sale projects, and discussed the Project's consistency with each of its eleven recommendations. FS: 55603-04.

33

Plaintiffs are correct that the Project does not meet Christensen et al. (1993)'s recommendation of 50% habitat effectiveness.  Christensen says "[a]reas where habitat effectiveness is retained at lower than 50 percent must be recognized as making only minor contributions to elk management goals.  If habitat effectiveness is not important, don't fake it.  Just admit up front that elk are not a consideration."  FS: 22310.  The Forest Service admits in the record that it does not meet the 50% recommendation.  FS: 55592.  Significantly, however, the Project will improve habitat effectiveness from its current level to 49%.  *Id.*  The Forest Service never adopted the Christensen (1993) recommendation, and the Forest Plan does not require 50% habitat effectiveness.  Thus, this case is distinguished from *Weldon* and Plaintiffs' arguments fail on this subject. Defendants did not violate NFMA or NEPA by failing to consider temporary roads as part of their analysis of the Project's effects on elk.

### 3.  Elk Security Buffers: Failure to Exhaust

Defendants' argument regarding exhaustion will be examined prior to reaching the merits of this claim.  Defendants contend Plaintiffs never complained during the administrative comment or appeal process that security buffers should be expanded due to closed roads, and are thus barred from now asserting this claim.  (Doc. 18 at 32.)  Plaintiffs respond that they expressed concerns about elk

34

security in general terms which was sufficient to satisfy the exhaustion requirement.

The Administrative Procedure Act compels plaintiffs to exhaust all administrative remedies prior to filing a complaint in federal court. *Idaho Sporting Congress, Inc. v. Rittenhouse*, 305 F.3d 957, 965 (9th Cir. 2002). The Forest Service is also specifically required to exhaust pursuant to 7 U.S.C. § 6912(e) and 36 C.F.R. § 215.20. *Id.* Exhaustion is required "to ensure that the agency possessed of the most expertise in an area be given first shot at resolving a claimant's difficulties." *Id.* (citing *Saulsbury Orchards & Almond Processing, Inc. v. Yeutter*, 917 F.2d 1190, 1195 (9th Cir.1990). Claimants may alert the decision-maker to problems using general terms rather than specific legal arguments, but the issue must be raised with sufficiently clarity to provide a fair opportunity to rule. *Id.*

Plaintiffs did raise general concerns about elk security in their notice of appeal to the Forest Service, but did not specifically contest the lack of expansion of security buffers due to closed roads within the Project area. FS: 56829-32; 56850-51. In *Idaho Sporting Congress*, the district court held that Plaintiffs failed to exhaust their claim that the Forest Service failed to conduct population surveys or monitor old-growth-dependent management indicator species based on the

35

following arguments:

- As you know, an issue of particular importance to us is protection of old growth habitat and old growth dependent species.... [Y]ou have failed to discuss how habitat for your old-growth Management Indicator Species will be extirpated while habitat for old-growth dependent species will remain unharmed.

- The [Lightning Ridge EA] violates NEPA and NFMA because it completely fails to disclose and analyze effects on sensitive species.... Nowhere in the EA can one determine the forest-wide impacts accumulated to by [sic] this project to old growth sensitive species.

- [The Long Prong EIS] fail[ed] to explain the direct, indirect, and cumulative effects of the alternatives on old growth dependent and Sensitive species.

305 F.3d at 965-66. The Ninth Circuit reversed, holding that "it would be unreasonable to require that the Conservation Groups incant the magic words 'monitor' and 'population trends' in order to leave the courtroom door open to a challenge citing the requirements of section 219.19." *Id.* at 966. More recently, however, the Ninth Circuit has held that "claims raised at the administrative appeal and in the federal complaint must be so similar that the district court can ascertain that the agency was on notice of, and had an opportunity to consider and

decide, the same claims now raised in federal court." *Great Old Broads for Wilderness v. Kimbell*, 709 F.3d 836, 846-47 (9th Cir. 2013).

Plaintiffs' appellate claims regarding elk security were not specific enough to satisfy their exhaustion requirement. Plaintiffs never discussed closed roads in relation to elk security buffers in their appeal to the Forest Service. While the Court is aware that general terms are sufficient to raise an issue for exhaustion purposes, "elk security" is too broad a term to give the Forest Service a fair opportunity to consider the issue Plaintiffs now raise. Elk security can involve issues such as security during implementation (as previously discussed), private land exclusion, protection of bull elk during hunting season, or compliance with the Montana Elk-Logging Study. Although Plaintiffs were not required to point to the specific regulation or statute they believe will be violated, their claims must be so similar that the Court can ascertain the Forest Service was on notice. The evidence Plaintiffs set forth here does not establish that such notice was provided. Plaintiffs failed to exhaust this issue and the Court will not consider it.

## B.  Project Elk Habitat Effectiveness and Security

The Forest Service adopted a site-specific amendment by exempting the Project from Standards 3 and 4(a) because it determined the Project would not prevent maintenance and improvement of elk habitat over time or preclude

37

Montana Fish Wildlife & Parks from achieving its elk population objectives. FS: 52092-93. Forest plan amendments are permitted by statute and can modify the plan in any way if the Forest Supervisor determines the changes will be insignificant to the plan's overall objectives. 36 C.F.R. § 219.10(f) (2000)(If the change resulting from the amendment is determined not to be significant for the purposes of the planning process, the Forest Supervisor may implement the amendment following appropriate public notification and satisfactory completion of NEPA procedures); 16 U.S.C. § 1604(f)(4).

The Forest Service considered Christensen et al. (1993) and many other studies including Lyons (1993) and Hillis et al. (1991) in examining elk habitat effectiveness and security. (Doc. 18 at 38.) Helena Forest Supervisor Kevin Riordan determined the amendment would remove some hiding cover within the Cabin Creek and North Fork EHUs. *Id.* at 52090. However, this loss will occur naturally in the same time period due to tree mortality from mountain pine beetle infestation. *Id.* Riordan found that "the removal of hiding cover from a total of 2,503 acres in both EHUs may in the long run be more beneficial for elk in terms of quickening the regeneration rate of new forests." *Id.* at 52091. Riordan recognized that elk may be temporarily displaced during Project activities and included mitigation measures as previously discussed to minimize the

38

disturbances. *Id.*

Plaintiffs argue the EIS standards replaced the amendment standards for elk hiding cover and open road density and the Project fails those substitute standards. Specifically, Plaintiffs contend that because Defendants analyzed Hillis for elk security and Christensen for elk habitat effectiveness in the EIS, those standards became the new standards for the Project instead of the amendment standards. (Doc. 21 at 26.)  Defendants respond that the EIS does not create a standard for elk effectiveness and security that trumps the Forest Plan Amendment and the Project improves habitat effectiveness.

### 1.  EIS Standards Do Not Replace the Forest Plan Amendment

Plaintiffs rely on *Ecology Center, Inc. v. Austin*, 430 F.3d 1057 (9th Cir. 2005) in support of their contention that the EIS standards replace the amendment standards for effectiveness and security because "otherwise the EIS would be misleading and there would be no guarantee that the project complies with NFMA's substantive mandates." (Doc. 15 at 24.)  In *Ecology Center*, the Ninth Circuit determined the Forest Service's failure to comply with a Regional Soil Quality Standard that was not incorporated into the Forest Plan was arbitrary and capricious because the EIS discussed the standard as if it was binding and claimed the Project complied with the standard.  430 F.3d at 1069-70.  Thus, the EIS was

39

misleading in violation of NEPA. *Id.* at 1069.

Plaintiffs do not point to any record citations demonstrating Defendants used the Christensen standards for habitat effectiveness in a manner that misled the public. Hence, Plaintiffs' claim fails on this issue.

Regarding elk security, the Forest Service's thorough analysis and citations to Hillis do not substitute those standards in place of the site-specific amendment. Plaintiffs point to language in the record of decision that they contend shows Defendants misled the public:

> Implementation of the "Hillis Paradigm", as this method is called, will ensure that elk security is optimized during hunting season. This methodology identifies blocks of forest over 250 acres and at least ½ mile from an open road as important for providing elk security. Security areas are well distributed throughout the project area; as such, they should be usable by elk throughout the hunting season as weather conditions change.

FS: 56215-16. Defendants also mention Hillis (1991) in the EIS as follows:

> Elk security is based on Hillis et al. (1991) and generally includes large areas > 250 acres and > ½ mile from an open road (during the hunting season). The 'Hillis' paradigm also includes a cover consideration; however, this is not mandatory in order to satisfactorily model and provide elk security within a herd unit. Hills et al. state that "[i]n analyzing security requirements for a specific area, interpretation of the guidelines is needed to ensure that the result makes biological sense for local conditions. The point of designating elk security areas is not to meet some generalized guidelines, but to provide functional habitat.

FS: 55454-55. Defendants contend they did not ever indicate that they were

meeting the >30% standard and also stated in the record of decision that neither herd unit meets the Forest Plan standards.

Defendants clearly mention Hillis (1991) and use the study's methodology as a basis for their elk security findings. These statements did not mislead the public as compared to *Ecology Center* and *Weldon*, however. The purpose and intent of a Forest Plan Amendment would be destroyed if the Forest Service was nonetheless required to comply with any studies cited in the EIS. Further, the Project actually increases habitat effectiveness, and regardless, elk hiding cover will be naturally reduced due to tree mortality from pine beetle infestation. For these reasons, the Hillis (1991) standards did not replace those of the site-specific amendment.

### 2. Public Notification of the Site-Specific Amendment

The 1982 regulations apply to the amendment. The transition rule permits the Forest Service to use either the 1982 or 2000 regulations for forest plan amendments. Plaintiffs argue the 2000 regulations apply to the amendment by default because Defendant never specified that the 1982 regulations governed. Defendants respond by pointing to several instances within the record showing they are following the 1982 regulations for the amendment. FS: 56225; 55127, 55159. Plaintiffs also recognized that the 1982 regulations apply to the

41

amendment in their comments and questions regarding the draft EIS. FS: 56147.
Thus, the Court finds that the 1982 regulations apply to the amendment.

The 1982 regulations provide, in relevant part, "[i]f the change resulting
from the amendment is determined not to be significant for the purposes of the
planning process, the Forest Supervisor may implement the amendment
following appropriate public notification and satisfactory completion of
NEPA procedures." 36 C.F.R. § 219.10(f) (2000). The change from the
amendment was determined not to be significant for this Project, so the Forest
Service was required to provide appropriate public notification and complete
NEPA procedures.

Defendants provided appropriate public notification of the amendment.
Defendants appended the amendment to the Record of Decision and provided a
period for public comment and appeal. FS: 56233. Plaintiffs' argument that
Defendants were required to have a draft NEPA analysis and public comment
period for the amendment is not persuasive. The *Block* decision cited by Plaintiffs
does not apply specifically to forest plan amendments so it is not relevant to this
issue. *State of Cal. v. Block*, 690 F.2d 753 (9th Cir. 1982). Plaintiffs do not cite
any authority to support their contention that the regulation language requiring
completion of NEPA procedures applies specifically to amendments and not to the

Project as a whole.  Plaintiffs' expansive reading of the regulation conflicts with the principles governing NEPA because NEPA requires environmental analysis before a federal action that significantly affects the human environment.  *Id.*  Here, the Forest Supervisor determined the amendment would not result in significant deviation from the Forest Plan goals.

Defendants point to several times when the public was notified of the amendment and given an opportunity to respond, beginning with the notice of intent to conduct an EIS in December 2005.  (Doc. 18 at 41-42.)  The Draft EIS acknowledged that standards 3 and 4(a) would not be met and an amendment would be required.  FS: 50687; 50715-735.  The amendment was attached to the ROD and could have been appealed after its issuance in 2012.  The public was adequately notified in compliance with the 1982 regulations and Plaintiffs' arguments fail on this issue.

### 3. Cumulative Effects of Amendment

Plaintiffs next argue Defendants violated NEPA by failing to take a hard look at the cumulative impacts of the amendment.  Specifically, Plaintiffs say the Forest Service fails to quantify and discuss the chronic Forest-wide violations of Standards 3 and 4(a) in its amendment analysis, citing *Native Ecosystems Council v. Dombeck*, 304 F.3d 886 (9th Cir. 2002).  (Doc. 21 at 29.)  Defendants respond

43

that the EIS considered the cumulative effects of the amendment by stating that long-term the Project will provide adequate hiding cover, effectiveness, and security. Defendants also assert that Plaintiffs' arguments regarding Forest-wide violations did not consider all EHUs in the Forest, only those near human activity.

Cumulative impact "is the impact on the environment which results from the incremental impact of the action when added to other past, present, or reasonably foreseeable future actions." *Dombeck*, 304 F.3d at 895 (citing 40 C.F.R. §§ 1508.7 (2001)). *Dombeck* involved one of 12 timber sales that were part of the Gallatin Land Consolidation Act of 1998. 304 F.3d at 896-897. The Court held that the Forest Service's failure to discuss the cumulative effects of the road density amendments for all 12 sales in the EA violated NEPA. *Id.* All of the sales were proposed to occur within two years of each other, were in the same national forest, and would effect separate but additive changes to the density of roads within the area. *Id.* at 897. The Court held that "[b]ecause the amendments are reasonably foreseeable and may have cumulative impacts within the Gallatin National Forest, the Forest Service has a duty to consider them in its analysis of impacts within the Darroch-Eagle EA." *Id.*

*Dombeck*'s requirement for a cumulative effects analysis does not apply here because this Project is not one of many timber sales within the Forest set to

occur within a short period of time.  Rather, Defendants assert timber harvest is

unlikely on private lands in the Project area for the next 50 years.  FS: 55540.

Despite this, the Forest Service did provide a cumulative effects analysis in the

EIS.  FS: 55601.  The analysis in the EIS states:

> Elk are analyzed at the 63,394 acre mid-scale boundary. Because elk have a
> strong fidelity to their winter range, cumulative effects of past, present, and
> foreseeable future actions are generally confined to the elk herd unit.
> Moreover, their strong fidelity to their herd unit means that cumulative
> effects in adjacent herd units would not affect elk in the two herd units
> encompassing the project area. The affected herd units include the North
> Fork herd unit at 25,784 acres and the Cabin Creek herd unit at 37,610
> acres.

Plaintiffs do not explain why this analysis is incorrect, and, as the Court

previously found, there are no other upcoming timber sales, as in *Dombeck*, that

would require a cumulative effects analysis.  The EIS goes on to provide detailed

data about the impacts on elk within the two effected EHUs.  FS: 55597-99.

Although this analysis does not contain the exact specific EHU findings

cited by the Plaintiffs, it appears that the figures cited by Plaintiffs are based on

the Roadside Hazard Tree EA which did not consider all EHUs in the Forest.  FS:

52076-78.  Also, to the extent Plaintiffs argue a cumulative effects analysis was

required for all the site-specific Forest Plan amendments, the Forest Supervisor did

so by stating "[c]umulatively, changes to elk hiding cover from this and past site-

specific forest plan amendments have not compromised the forest's ability to provide habitat potential to meet Forest Plan elk population goals." (Doc. 18 at 45.)  This analysis is sufficient to satisfy NEPA and demonstrates that the site-specific amendments to the Forest Plan will not lead to piecemeal destruction of elk habitat in the Forest.

### C. Compliance with Management Area T-3 Standards

Next, Plaintiffs allege the Project violates the Forest Management Area T-3 Standard requiring openings created by timber harvest to be reforested to meet the big game hiding cover requirements before harvesting adjacent areas.  The Forest Plan defines hiding cover as "vegetation capable of hiding 90 percent of a standing adult deer or elk from the view of a human at a distance equal to or less than 200 feet."  FS: 51582.

The ROD discusses this issue as follows:

> Prior to implementation, these past plantations will be surveyed
> in order to determine their current contribution to hiding cover. If
> they do not meet hiding cover definitions (i.e. ability to hide 90%
> of an elk at 200 feet), then buffers would be retained between
> those areas in order to provide some level of cover between past
> and proposed treatment units.

FS: 56250.  Plaintiffs object that the "some level of cover" language does not ensure compliance with the 40-acre requirement.

46

Defendants performed field data on the only opening adjacent to proposed treatment units in the T-3 area in August 2012.  Data collected at two points within past regeneration harvest areas revealed all eight measurements at greater than or equal to 90% hiding cover.  From this data, Defendants conclude that "past regeneration harvest units adjacent to proposed treatments in T-3 are currently providing elk cover." FS: 19184.  Defendants also determined the 40-acre minimum is met because the past regeneration harvest units are adjacent to larger areas of hiding cover. FS: 19184.  Defendants complied with the 40-acre Management Area T-3 Standard and did not violate NFMA.

### D.  EIS Consideration of Whitebark Pine

Plaintiffs argue Defendants failed to take a hard look at whitebark pine restoration and failed to consider the best available science by not considering the five factors from the Keane & Parsons (2010) study.  Plaintiffs are correct that Defendants do not list the five factors outlined in the Keane & Parsons (2010) study.  However, Defendants do discuss the substance of the factors at various points throughout the EIS, FS: 55393-94; 55419-28; 55477-78; 55557-59, and the record contains the entire study, FS: 28493-28508.  Defendants also cite the Keane &Parsons (2010) study in the EIS, FS: 55477, and the ROD describes their intent to plant whitebark pine seedlings "to augment natural regeneration and achieve

47

species composition goals." FS: 56231. This evidence demonstrates the study was clearly considered, and Plaintiffs do not point to any authority requiring Defendants to detail specific language from a study in order to satisfy NEPA and NFMA.

The authority Plaintiffs do cite leads the Court to the opposite conclusion. Plaintiffs rely on *Native Ecosystems Council v. United States Forest Service*, 418 F.3d 953 (2005) for the proposition that Defendants' failure to disclose the five recommendations from Keane & Parsons (2010) in the EIS violates NFMA and NEPA. (Doc. 21 at 32.) *Native Ecosystems* states that "[t]he question is whether we can reasonably discern from the record that the Forest Service complied with the HNF Plan's Big Game minimum hiding cover standard, HNF Plan Big Game Standard # 3, and thereby complied with NFMA." 418 F.3d at 961-62 (citing *Motor Vehicle Mfrs. Ass'n*, 463 U.S. at 43 (holding that courts must "'uphold a decision of less than ideal clarity if the agency's path may reasonably be discerned'") (quoting *Bowman Transp., Inc. v. Arkansas–Best Freight Sys.*, 419 U.S. 281, 286 (1974)). Although Defendants did not specifically identify the five factors in the EIS, they did analyze the factors sufficiently throughout the EIS, as well as cite to the Keane & Parsons (2010) study and include the study in the record. Through this evidence, the Court can discern the Forest Service's path

48

regarding whitebark pine restoration.  Defendants considered the Keane & Parsons (2010) study and did not violate NEPA or NFMA.

### E.  EIS Consideration of Lynx and Grizzly Bear Presence

Plaintiffs claim Defendants failed to take a hard look and disclose the potential presence of lynx and grizzly bear because the Forest Service does not provide sufficient data regarding the reported sightings of the animals.  Plaintiffs' NEPA claims regarding grizzly bears fail for many of the same reasons their ESA grizzly bear claims fail.  Plaintiffs' NEPA claims regarding lynx also fail because Defendants' monitoring of lynx satisfies NEPA, despite the fact that Defendants used the incorrect standard under the ESA to determine whether lynx may be present in the Project area.

Agencies must abide by NEPA's procedural requirements to "carefully consider" a project's environment impacts and make the relevant information available to the public.  *Robertson v. Methow Valley Citizens Council*, 490 U.S. 332, 349 (1989).  An EIS must provide a "full and fair discussion of significant environmental impacts," and inform "decisionmakers and the public of the reasonable alternatives which would avoid or minimize adverse impacts or enhance the quality of the human environment." 40 C.F.R. § 1502.1.

Under NEPA, the Court must "simply [] ensure that the Forest Service made

49

no 'clear error of judgment' that would render its action 'arbitrary and capricious.'" *Lands Council I*, 537 F.3d at 991. A decision is arbitrary and capricious "only if the agency relied on factors Congress did not intend it to consider, entirely failed to consider an important aspect of the problem, or offered an explanation that runs counter to the evidence before the agency or is so implausible that it could not be ascribed to a difference in view or the product of agency expertise."

Defendants' monitoring programs for grizzly bears include radio-collar telemetry, field collection of hair and DNA samples, and verified sightings of living and dead grizzly bears. FWS: 1-73. The Forest Service sent a biologist to investigate the purported grizzly sighting in the Big Belts even though it was not near this Project area. This monitoring satisfies NEPA's required "hard look" and Defendants' considerations were not arbitrary and capricious. Further, Defendants were not required to address the best available science on grizzly bear management in the EIS because they correctly determined grizzly bears are not a species that may be present within the Project action area.

Similarly, Defendants closely monitor the Forest for presence of lynx by examining data of physical remains, live captures, and DNA samples, as well as the 1999-2002 National Lynx Survey. FWS: 394; 268. Although the Court

previously determined that Defendants violated the ESA by substituting the

"occupancy" standard for the "may be present" standard, the NEPA arbitrary and

capricious standard is much more deferential than the ESA's "may be present"

standard. Defendants' monitoring programs and examination of the National Lynx

Survey satisfy NEPA and their decision on this issue was not arbitrary and

capricious.

### F. EIS Consideration of Standard ALL S1

Standard ALL S1 within the Lynx Direction provides that "[n]ew or

expanded permanent development and vegetation management projects must

maintain habitat connectivity in an LAU and/or linkage area." FS: 43215.

Plaintiffs argue the EIS fails to disclose and apply the Forest Plan Standard for

lynx linkage areas, Standard ALL S1, which they assert the Forest Service

concedes applies to the Project. Defendants argue Standard ALL S1 does not

apply to the Project, but admit that the Appeal Reviewing Officer incorrectly

stated in the record that the Standard does apply.

The Lynx Direction applies to lands that are known to be occupied by lynx.

For lands that are unoccupied, the Lynx Direction should be considered but is not

required to be followed. FS: 43215. The Big Belts are currently unoccupied, so

Defendants were not required to comply with Standard ALL S1. FS: 55456.

Nonetheless, Defendants considered the Lynx Direction standards and concluded the Project will meet Standard ALL S1 even though they were not required to do so.  FS: 43215.  Thus, there is no violation of NFMA regarding Defendants' adherence to Standard ALL S1.

CONCLUSION

In sum, Plaintiffs' motion to supplement will be denied and Plaintiffs' motion for summary judgment will be granted as to the Section 7 ESA claim regarding lynx and denied in all other respects.  This case will be remanded and the Project will be enjoined pending compliance with the law as outlined in this order.

Accordingly, IT IS ORDERED that Plaintiffs' motion to supplement (doc. 9) is DENIED.

IT IS FURTHER ORDERED that Plaintiffs' motion for summary judgment (doc. 13) is GRANTED as to the ESA lynx claim and DENIED as to all other claims.  Defendants' motion for summary judgment (doc. 17) is DENIED as to the ESA lynx claim and GRANTED as to all other claims.

IT IS FURTHER ORDERED that the Defendants are ENJOINED from implementing the Cabin Gulch Project, and this matter is REMANDED to the Wildlife Service and the Forest Service to address the deficiencies identified in

52

this opinion.

The Clerk of Court is directed to (1) enter judgment for Plaintiffs and against Defendants in accordance with this Order and (2) close this case.

Dated this 24th day of June, 2013.

Dana L. Christensen, Chief Judge
United States District Court